**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| OFFICE OF DISCIPLINARY COUNSEL, | : | No. 2623 Disciplinary Docket No. 3 |
| Petitioner | : | |
| | : | No. 158 DB 2017 |
| v. | : | |
| JONATHAN F. ALTMAN, | : | Attorney Registration No. 25679 |
| Respondent | : | (Chester County) |
| | : | ARGUED: November 21, 2019 |

**OPINION**

**JUSTICE MUNDY** **DECIDED: APRIL 22, 2020**

Respondent, Jonathan F. Altman, has filed exceptions to the Report and Recommendations of the Disciplinary Board of the Supreme Court of Pennsylvania ("Disciplinary Board" or "Board") recommending his disbarment. Upon our *de novo* review of this matter, we agree with the Board that Altman's disbarment is warranted.

On October 11, 2017, the Office of Disciplinary Counsel filed a petition for discipline alleging that Altman engaged in misconduct arising from his representation of Marie Cahill. Proceedings were held before a three-member Hearing Committee on January 16, 2018 and May 15, 2018.

Prior to the commencement of the Hearing, Altman admitted to violating the following Rules of Professional Conduct:

> 1.      RPC 1.8(a) - A lawyer shall not enter into a business transaction with a client . . . or other pecuniary interest adverse to a client unless:
>
>> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
>>
>> (2)  the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
>>
>> (3)  the client gives informed consent in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction;
>
> 2.      RPC 1.8(e) - A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation.
>
> 3.      RPC 1.8(j) - A lawyer shall not have sexual relations with a client unless a consensual relationship existed between them when the client-lawyer relationship commenced; and
>
> 4.      RPC 1.16(a)(1) -  A lawyer shall not represent a client or, where representation has commenced, shall withdraw . . . if the representation will result in violation of the Rules of Professional Conduct or other law.

The following facts were stipulated by the parties or were testified to at the hearings.  Altman, who was born in 1950, was admitted to practice law in Pennsylvania in 1977.  In December 2012, Cahill contacted Altman upon receiving a foreclosure notice after her ex-husband had failed to pay taxes on the marital property.  On December 21, 2012, Cahill met Altman for the first time at his office to discuss potential representation involving her ex-husband's breach of a marital property settlement agreement and contempt of a court order to pay taxes associated with the marital property (the breach of

contract action). Altman entered into a written contract with Cahill for the breach of contract action, and he explained the terms of his legal fees. Cahill told Altman that her second husband had recently died, and that she was having serious financial problems supporting herself and her four children.

On July 3, 2013, after representing Cahill in the breach of contract action, Altman met with Cahill and her parents regarding a child support action, an emergency petition for modification of custody and a protection from abuse action. Altman provided a written fee agreement to Cahill and her parents for a non-refundable retainer of $2,500. Cahill's parents paid the fee because she could not afford to pay Altman. Altman did not obtain Cahill's informed consent in writing with respect to the nonrefundable retainer other than to deposit the fee into an IOLTA account until withdrawing the funds after they were earned.

Altman represented Cahill from December 21, 2012 through August 2015. During the course of the representation, Altman made inappropriate remarks to Cahill, and between August 2013 and September 2013 they had five consensual sexual encounters. Beginning in July 2013, Altman represented Cahill in the sale of her home.

In anticipation of listing Cahill's home for sale, Altman financially assisted Cahill with the purchase of various items from Lowe's and other retailers that were charged to his Lowe's credit card, Visa card and his personal bank account. He agreed to loan his credit cards to Cahill for goods and services in an attempt to keep her from telling his wife about their affair. Altman did not enter into a written agreement with Cahill disclosing the terms of a loan including repayment. Altman did not advise Cahill in writing to seek the advice of independent legal counsel about the terms of a loan transaction, nor did he request or obtain from Cahill her informed consent in writing as to the essential terms of the loan transaction.

In July 2013, based upon Altman's recommendation, Cahill hired Altman's former client James Jackson, and Leonard Jones to make repairs to Cahill's home. No written work orders were given to Jackson and Jones, and neither prepared or sent invoices to Altman or Cahill.

By check dated September 20, 2013, Altman paid Jones $325.00 for "Cahill Work" as noted on the memo line. By check dated November 13, 2013, he also paid Jones $150.00 for "Cahill Labor" as noted on the memo line. By check dated November 8, 2013, Altman gave Cahill $1,000.00 for a "loan" as noted on the memo line.

Jackson and Jones signed affidavits drafted by Altman, which contained work orders summarizing the work they performed. The work orders included two consecutive entries for 112 hours for landscaping and power washing at Cahill's home. The work orders totaled 615 hours of labor. N.T. 5/15/18 at 199-200. Jackson testified that Altman paid him between $1,000.00 and $2,000.00 for services at Cahill's home, and that Altman paid Jones $1000.00 for such services. N.T. 1/16/18 at 186, 204. Altman testified that he does not have invoices and other receipts evidencing payment to Jackson and Jones or any other contractors because he purged his files and discarded the receipts about one year after Cahill's real estate closing. N.T. 5/15/18 at 33.

On February 13, 2014, Cahill learned that Altman claimed she owed him between $25,000.00 and $30,000.00 for work done at her home. *Id.* at 87. On April 23, 2014, Altman attended the real estate closing along with Cahill, where he presented her with two handwritten invoices, one for repayment of a loan in the amount of $30,188.57 for items purchased, installation costs and labor charges for Jackson and Jones, and one for unpaid legal fees in the amount of $10,450.00. The HUD-1 Statement included a line item that Altman's law firm was paid $10,450.00 for legal fees and a line item that Altman

and his wife were paid $30,188.57 for a personal loan repayment from Cahill's sale proceeds.

On October 5, 2015, Altman filed a verified collection complaint against Cahill in the magisterial district court captioned *The Altman Law firm, LLC v. Marie Cahill*, Docket No. CV-082-15 (MDJ Action), for breach of an oral agreement and the July 3, 2013 fee agreement, claiming that Cahill owed $5,480.66 as of September 1, 2015, including interest at 15% per annum. Altman admitted that the billing for legal fees was inaccurate. The complaint was never served.

On November 12, 2015, Cahill sued Altman, his wife Mary Altman and Altman's law firm in the Philadelphia County Court of Common Pleas in an action captioned *Cahill v. Altman, et al.*, Docket No. 2015-1688 (Cahill Civil Action). The complaint raised claims of conversion and fraud in connection with the sale of her home and his unauthorized taking of settlement proceeds; professional liability in connection with the sexual relationship he engaged in during the course of the lawyer-client relationship; negligent infliction of emotional distress; and breach of contract and disgorgement of all legal fees paid to him.

On March 10, 2016, Altman filed an answer, new matter and counterclaim on behalf of himself, his wife and his law firm. In the answer, he admitted to the sexual relationship with Cahill while representing her. The counterclaim alleged Cahill breached the July 3, 2013 fee agreement for which Altman sought unpaid legal fees of $4,913.33, plus 15% interest per annum for a total of $5,319.35. He attached the same inaccurate billing statement to the counterclaim as he did to the complaint he filed in the MDJ Action.

During the Cahill Civil Action, Altman attempted to prevent his wife from being deposed by asserting marital privilege, even though she was identified as a party to the loan on the HUD sheet. Motion for Protective Orders, 4/20/16. By order dated March 9,

2016, the Philadelphia Court of Common Pleas sanctioned Altman for failure to comply with a discovery order.

In September 2016, the parties entered into a tentative settlement of the Cahill Civil Action. As part of the proposed settlement, on the advice of the settlement master, Altman sought to prohibit Cahill from participating in or cooperating in any disciplinary complaint or proceedings against him. However, the specific language was removed from the release once Altman learned that he was not permitted to include it.

On September 16, 2016, Office of Disciplinary Counsel informed Altman of the allegations against him by way of a DB-7 Request for Statement of Respondent's Position. On November 11, 2016, Altman answered the DB-7 and included the affidavits he prepared on behalf of Jackson and Jones.

On December 23, 2016, the Cahill Civil Action settled and in accordance with the agreement Altman paid Cahill $26,000.

Office of Disciplinary Counsel filed a petition for discipline against Altman on October 11, 2017, to which he filed an answer on October 25, 2017.

Office of Disciplinary Counsel presented two witnesses at the hearing, Altman's former client, Christy McDowell, and her mother, Barbara McDowell, who is a nurse. Barbara testified that she and Christy went to Altman's office for an initial consultation at Altman's office in 2012. Because they had a mutual friend, Altman charged a reduced rate of $1,000.00 for his services. While at his office, Altman asked Christy and Barbara to massage his shoulder. Although Barbara felt uncomfortable, she complied because of the reduced fee. N.T. 1/16/18 at 106-110. Christy confirmed her mother's testimony. *Id.* at 135.

Cahill did not testify at the disciplinary hearing. However, the parties stipulated that if called, Cahill would have testified to the following in conformity with the allegations

in the verified complaint in the Cahill Civil Action: Altman preyed upon her vulnerabilities; had a sexual relationship with her from January 2013 through September 2014;[1] knew about her dire financial straits; knew that she would do anything to regain and retain custody of her children; repeatedly told her that she would not regain nor retain custody of her children without his assistance; intimidated her, causing her to believe she needed his assistance; threatened to withdraw as her attorney if she did not comply with all his requests for sexual favors to his satisfaction; caused her to fear he would show up at her home and harass her family; caused her to experience physical ailments and endure emotional trauma due to his demands for sexual favors while reminding her that she would lose her children; and had been paid $23,500.00.

At the hearing, Nelson Diaz, a retired judge of the Philadelphia Court of Common Pleas, testified that Altman has a good reputation in the legal community, but that the legal community is not aware of Altman's misconduct. N.T. 1/16/18 at 40, 41, 54, 55. John Hare, Esquire, testified members of the legal community would agree that Altman has a good reputation, but they would not have knowledge of his behavior toward Cahill. *Id.* at 61-64.

William Maston, Esquire, a pastor at the Church of the Savior, testified regarding Altman's good reputation in the church community but he did not know if the community was aware of Altman's misconduct. *Id.* at 77-78. Dominick Savoca, an elder with the Hope Community Church, who has known Altman since 2006, testified that he learned of Altman's marital problems in 2015 due to an affair with Cahill. *Id.* at 124-26. Savoca

---

[1] Altman and Office of Disciplinary Counsel stipulated that Altman and Cahill had a sexual relationship that began in August 2013 that continued through September 2013. Stipulations of the Parties, 1/11/18, at ¶ 16. They further stipulated that if Cahill were called to testify at the disciplinary hearing, she would testify consistently with the allegations in the Cahill Civil Action that the sexual relationship began in January 2013 and continued through September 2014. *Id.* at ¶ 17.

provided ten marriage counseling sessions to Altman, two or three of which Altman's wife also attended. *Id.* at 129.

Taisha Boyer, a former client of Altman who later worked for him, testified they have known each other for thirteen years during which time he has never harassed her or engaged in sexually inappropriate conduct. *Id.* at 148. She testified that among clients, church members and mutual friends, Altman has a reputation as a truthful, honest and peaceful person. *Id.* at 151. However, she testified that these people did not know about Altman's sexual relationship with his client. *Id.* at 160.

Altman's wife testified that he told her about the affair with Cahill in November 2015 after Cahill filed suit against him, and that he accepts responsibility for his actions. *Id.* at 168, 173.

James Jackson testified about the work that he and others did on Cahill's house. The summary of work orders that he drafted, which was attached to his affidavit, was based on his recollection rather than on documentation of the work completed. *Id.* at 191-92, 196.

Altman testified on his own behalf, stating that Cahill initiated the sexual relationship and that he was in a "weakened state" and "not strong enough to resist." N.T. 5/15/18 at 61, 232. As a result of this experience he has learned, "I can't put myself in a position where I'm alone with a female." *Id.* at 133. Altman further acknowledged that his misconduct in having a sexual relationship with a client was a "big mistake." *Id.* at 139. Altman testified that he agreed to pay for Cahill's home repairs and landscaping because he has a "big heart, and I help people." *Id.* at 66. He stated, "There's no question in my mind that [Cahill] trusted me as a lawyer, and I did very well by her in everything I did for her. She got exceptional results." *Id.* at 191. Altman apologized to Cahill through her attorney. *Id.* at 140.

On December 3, 2018, the Hearing Committee filed a Report noting that Altman misused his position as an attorney to engage in prohibited sexual and financial relationships with his client, and that he failed to terminate his representation of his client as required by the Rules of Professional Conduct. The Hearing Committee also determined that Altman misused the legal system by filing meritless claims for unpaid fees, filing a meritless counterclaim which included false and misleading affidavits and bills, and filing a motion for protective order to preclude discovery. The Hearing Committee concluded that Altman's misuse of the legal system violated the following Rules of Professional Conduct:

> 1. RPC 3.1 - A lawyer shall not bring or defend a proceeding or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous;
>
> 2. RPC 3.4(a) - A lawyer shall not unlawfully obstruct another party's access to evidence;
>
> 3. RPC 8.4(c) - It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation; and
>
> 4. RPC 8.4(d) - It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

Upon review of the facts, the Hearing Committee reached the following conclusions with respect to Altman's misconduct:

> This is not a case of a minor conflict of interest due to sexual relations. This is not conduct that should be excused because it was consensual or because there was no coerced or forced sex. The evidence demonstrates that [Altman] had no regard for his client, no understanding of his position as a fiduciary and no regard for the integrity of the legal system. [Altman] still has not demonstrated that he understands the position of trust he holds as an attorney; he has not acknowledged that he misused his position as an attorney; and he has not accepted responsibility for the depth of his misconduct.

[Altman] is a risk to current and potential clients and he denigrates the integrity of the profession.

Hearing Committee Report, 12/3/18 at 14.

In recommending disbarment, the Committee noted:

> The overwhelming evidence establishes that [Altman] is unfit to practice law in the Commonwealth of Pennsylvania and no amount of suspension or rehabilitation will make him fit for practice. [Altman] has showed complete disrespect for the legal system, disregard for the public's trust and most importantly utter disregard for his clients. He has used his position as an attorney to prey upon his client's vulnerability to his own advantage. [Altman] has disregarded his personal commitment to uphold the laws of the Commonwealth and the Rules of Professional Conduct. Lack of remorse and misuse of his position as an attorney for personal purposes are aggravating factors.

*Id.* at 14-15.

Altman filed exceptions to the recommendation with the Board and requested oral argument, which was held before a three-member panel on March 25, 2019. The Board adjudicated the matter at a meeting on April 10, 2019, and issued a Report and Recommendations on May 30, 2019, recommending Altman's disbarment.

With respect to the relationship between Altman and Cahill, the Board noted that Altman "took advantage of . . . Cahill and abused her trust when he engaged in a sexual affair with her." Disciplinary Board Report and Recommendations, 5/30/19, at 18. The Board expressed dismay that Altman "portrays himself as the victim and has the temerity to assert that *he* was the one in the weakened state and . . . Cahill took advantage of *him*, despite the fact that [Altman] as the lawyer held the power in his relationship with . . . Cahill." *Id.* (emphasis in original).

In addition to the sexual relationship, the Board noted that Altman "engaged in improper and unauthorized business and financial transactions with . . . Cahill, which

constituted a conflict of interest in violation of RPC 1.8(a) and 1.8(e)." *Id.* at 19. The Board concluded:

> [Altman's] impermissible conflicts of interest and breach of trust by engaging in prohibited sexual and financial relationships with . . . Cahill erased the ethical lines between lawyer and client demanded by the rules. [Altman's] actions were certain to confuse . . . Cahill's understanding of the relationship she had with him, as simultaneously he was her legal advisor, sexual partner and business partner.

*Id.* at 20.

The Board further expressed concern that Altman had misused the legal system by filing collection actions against Cahill "based on inaccurate representations as to services rendered, [and] the corresponding unpaid debt and credits to . . . Cahill. [Altman] had no legitimate basis to claim that . . . Cahill owed him fees." *Id.* at 21. The Board was further troubled by the fact that during the course of the Cahill Civil Action, Altman improperly sought a protective order to preclude Cahill from taking his wife's deposition, and that he submitted "false invoicing in pursuit of questionable claims against his former client." *Id.*

In determining the appropriate discipline, the Board considered *Office of Disciplinary Counsel v. Edwin L. London*, Nos. 119 & 171 DB 2014 (Disciplinary Board Report filed 8/25/15; Supreme Court order filed 10/22/15), where this Court disbarred an attorney who engaged or attempted to engage in sexual relations with four of his female clients. The Board noted that London "abused his position of trust and singled out vulnerable clients who needed his services," *id.* at 32, thereby making his "law office . . . a place to prey on unsuspecting clients." *Id.* at 33. The Board also considered *Office of Disciplinary Counsel v. David Harold Knight*, 37 DB 2013 (Supreme Court order filed 7/17/13) (consent discipline)), where an attorney was suspended on consent for one year for engaging in sexual activity with a client. The Board distinguished *Knight* from the

instant matter because unlike Altman, "Knight did not bill his client, did not collect a monetary fee after accepting sex in lieu of a monetary payment and did not have a fee agreement. Knight agreed to discipline on consent to spare his client the embarrassment of testifying." Disciplinary Board Report and Recommendations, 5/30/19, at 22.

With respect to prohibited financial transactions, the Board looked to *Office of Disciplinary Counsel v. Willis W. Berry, Jr.*, 94 DB 2012 (Disciplinary Board Report filed 10/30/13; Supreme Court order filed 4/9/14) (suspension of a year and a day, for, *inter alia*, entering into business transaction with client without fully disclosing the terms in writing and without advising the client to seek the advice of independent counsel); *Office of Disciplinary Counsel v. Glenn D. McCogney*, 194 DB 2009 (Disciplinary Board Report filed 2/25/11; Supreme Court order 3/28/12) (disbarment for two matters, one of which involved obtaining loan from client but failing to disclose relevant information to client regarding terms of loan, failing to inform client of inherent conflict of interest in representation of the client and attorney's business dealings with client, and failure to obtain written consent of client); *Office of Disciplinary Counsel v. Jeffrey J. Howell*, 155 DB 2008 (Disciplinary Board Report filed 7/23/10; Supreme Court order filed 11/4/10) (five-year suspension for attorney who, *inter alia*, entered into transaction with client without ensuring that the terms were fair and reasonable, and fully disclosed and transmitted in writing); *Office of Disciplinary Counsel v. Mary Ellen Tomasco*, 11 DB 2004 (Disciplinary Board Report filed 11/22/05; Supreme Court order filed 3/10/06) (suspension of a year and a day for attorney who used power of attorney to obtain mortgage from client, without taking steps to protect client's interest as she did not engage separate counsel for client and did not record the indenture).

Noting that Altman "engaged in flagrant misconduct both in his sexual relationship and his business transaction with . . . Cahill, and simply does not want to take

responsibility," Disciplinary Board Report and Recommendations, 5/30/19, at 22, the Board recommended disbarment.

Pursuant to Altman's request, this Court granted oral argument which was held on November 21, 2019.

Our standard and scope of review in cases involving attorney discipline has been set forth as follows:

> Our Court conducts *de novo* review of all attorney disciplinary matters; however, "the findings of the Hearing Committee and the Board are guidelines for judging the credibility of witnesses and should be given substantial deference." *[Office of Disciplinary Counsel v.] Cappuccio*, 48 A.3d [1231,] 1236 [(Pa. 2012)]. In attorney disciplinary proceedings, the [Office of Disciplinary Counsel] bears the burden of proof of establishing an attorney's misconduct by a preponderance of the evidence. *Office of Disciplinary Counsel v. Preski*, 134 A.3d. 1027, 1031 (Pa. 2016). Because discipline "is imposed on a case-by-case basis, we must consider the totality of the facts presented, including any aggravating or mitigating factors." *Id.* However, even though each attorney disciplinary matter must be resolved according to its unique facts and circumstances, our Court nevertheless endeavors to maintain consistency in disciplinary matters "so that similar misconduct is not punished in radically different ways." *Id.* (quoting *Office of Disciplinary Counsel v. Lucarini*, 472 A.2d 186, 190 (Pa. 1983) (internal quotation marks omitted)).

*Office of Disciplinary Counsel v. Pozonsky*, 177 A.3d 830, 838 (Pa. 2018).

In advocating for a lesser sanction than disbarment, such as a private or public reprimand, Altman asserts that he "has been practicing law for 42 plus years, has no prior history of discipline, has a good reputation, presented excellent character witnesses and demonstrated remorse and reform." Respondent's Brief at 43. Altman repeatedly avers that the Hearing Committee and the Board failed to properly credit testimony regarding his reputation and good character. The Office of Disciplinary Counsel responds that Altman's character testimony and lack of prior disciplinary record cannot overcome his

taking advantage of "his superior position of power by engaging in ongoing sexual relations with [Cahill] . . . and engaging in business transactions with her without regard for . . . Cahill, knowing that she was financially strapped and was concerned about her ex-husband abusing their children." ODC's Brief at 19.

Altman admits that he was wrong to have sexual relations with a client, wrong not to have his client obtain independent counsel before he loaned her money with an understanding she would pay him back from settlement proceeds, and wrong in advancing funds to his client. However, despite the opprobrious nature of his misconduct, Altman rationalizes this was not a case of an attorney stealing money from a client or gaining an interest in her property. Noting that he represented Cahill in several matters over three years, Altman avers "[s]he never complained about his representation or expressed any dissatisfaction until Mr. Altman sued her in 2016 for some additional unpaid legal fees. After that, the legal malpractice suit was filed highlighting the sexual relations." *Id.* at 49.

Finally, Altman argues that the Board and the Hearing Committee presented no justification for recommending disbarment, "other than they appear to take the position that if a lawyer has sexual relations with a client, then the lawyer must be disbarred." *Id.* at 39. Such position, if held by the Board or the Hearing Committee, would be contrary to this Court's holding that the primary function of the disciplinary system is not punitive, but is to determine the fitness of an attorney to practice law. *Lucarini*, 472 A.2d at 190. However, the Board's recognition that in *Knight*, *supra*, this Court ordered a one-year suspension for an attorney's consensual sexual relationship with a client, indicates that the Committee was well aware that such misconduct does not inexorably lead to disbarment.

Here, the Board recognized that mitigating factors must be considered, such as Altman's four decades of legal practice without discipline and the testimony about his good character. Disciplinary Board Report and Recommendations, 5/30/19, at 22, 24.

Nevertheless, the following statements by Altman undermine his acceptance of responsibility and remorse for his actions:

> I never made any threat, coerced [Cahill] or anything. At worst, it was a consensual situation. And I take full ownership of it. I was in a weakened state. I should not have done it, but I did, and I regret it. And I have tremendous remorse about it and what it's done to my life.

N.T. 5/15/18, at 61.

> I have great regret that I ever [had sexual relations with Cahill]. I should have known better.
>
> What I've learned is that I can't put myself in a position where I'm alone with a female.

*Id.* at 133. His concern for how his misconduct has affected his life, rather than how it has affected his client's life or the reputation of the legal profession is telling. Altman's statement that he should not be alone with a female reflects a tendency to make excuses for his conduct (i.e., that he sees himself as weak) rather than an admission of an ethical failing on his part.

Altman has stipulated to violating the following Rules of Professional Conduct: Rule 1.8(a), regarding business transactions with a client; Rule 1.8(e), providing financial assistance to a client in connection with litigation; Rule 1.8(j), engaging in sexual relations with a client; and Rule 1.16(a)(1), failing to withdraw from representation where such representation results in a violation of the Rules. Accordingly, the only issue as to these violations is whether his conduct warrants disbarment or a lesser form of discipline. *See Office of Disciplinary Counsel v. Quigley*, 161 A.3d 800, 807 (Pa. 2017).

With respect to the issue of sexual relations between an attorney and client, Altman notes that several cases resulting in disbarment or suspensions have involved nonconsensual contact or contact with minors. *See Office of Disciplinary Counsel v. Christie*, 639 A.2d 782 (Pa. 1994) (five-year suspension for attorney who had sexual contact with intoxicated teenager); *Office of Disciplinary Counsel v. Cappuccio*, 48 A.2d 1231 (Pa. 2012) (disbarment of assistant district attorney who provided alcohol and marijuana to three minors in a church youth group he supervised, and had sexual relations with a member of the youth group); *Office of Disciplinary Counsel v. Mark Frankel*, No. 155 DB 2001 and 94 DB 2002 (disbarment of attorney who had indecent contact with young men in his office); and *London, supra* (disbarment of attorney who engaged or attempted to engage in sexual relations with four clients). Altman argues that these cases are distinguishable from the instant matter, especially due to the fact that he had consensual relations with Cahill.

In considering Altman's argument, we look to the Explanatory Comment to Rule 1.8(j), which provides:

> The relationship between lawyer and client is a fiduciary one in which the lawyer occupies the highest position of trust and confidence. The relationship is almost always unequal; thus a sexual relationship between lawyer and client can involve unfair exploitation of the lawyer's fiduciary role, in violation of the lawyer's basic ethical obligation not to use the trust of the client to the client's disadvantage. In addition, such a relationship presents a significant danger that because of the lawyer's emotional involvement, the lawyer will be unable to represent the client without impairment of the exercise of independent professional judgment. Moreover, a blurred line between the professional and personal relationships may make it difficult to predict to what extent client confidences will be protected by the attorney-client evidentiary privilege, since client confidences are protected by privilege only when they are imparted in the context of the client-lawyer relationship. Because of the significant danger of harm to client interests and because the client's own emotional involvement renders

> it unlikely that the client could give adequate informed consent, *this Rule prohibits the lawyer from having sexual relations with a client regardless of whether the relationship is consensual and regardless of the absence of prejudice to the client.*

R.P.C. 1.8(j) -Explanatory Comment (emphasis added).

The Explanatory Comment elucidates exactly why Rule 1.8(j) prohibits sexual relations between an attorney and client. In fact, the unequal relationship and the concomitant exploitation of the attorney's fiduciary role highlighted in the Explanatory Comment are patent in the instant matter. As the Explanatory Comment makes clear, Altman's repeated assertions that the consensual nature of his sexual relationship with Cahill, and the positive results he achieved on her behalf, compensate for his failure to appreciate the position of trust and the fiduciary role he exercised, are unconvincing.

With regard to the prohibited financial transactions, we agree with the Board that the cases it cited, *Berry*, *supra*; *McGogney*, *supra*; *Howell*, *supra*; and *Tomasco*, *supra* support imposition of significant discipline for Altman's failure to provide written notice to Cahill regarding the terms of the loans or to advise her to seek independent counsel to review the loans.

Altman also challenges the Board's conclusion that he violated Rules of Professional Conduct related to misuse of the court system. However, the record reflects that Altman filed a meritless MDJ action for legal fees based upon inaccurate representations regarding services rendered, thereby engaging in misrepresentation, in violation of Rule 8.4(c) and conduct prejudicial to the administration of justice, in violation of Rule 8.4(d). In Altman's counterclaim in the Cahill Civil Action, he included the same overstated demand for fees, and in addition submitted the false and misleading affidavits of James Jackson and Leonard Jones, thereby violating Rule 3.1 (a lawyer shall not bring or defend a proceeding or assert an issue which is frivolous), as well as Rules 8.4(c) and 8.4(d). In addition, Altman's filing of a meritless motion for protective order to prevent his

wife from being deposed, which led to a sanction for failure to comply with a discovery order, supports the conclusion that he obstructed another party's access to evidence, thereby violating Rule 3.4(a), as well as Rules 3.1 and 8.4(d).

As noted, we engage in *de novo* review in attorney disciplinary matters. However, "the findings of the Hearing Committee and Disciplinary Board are guidelines for judging the credibility of witnesses and should be given substantial deference." *Office of Disciplinary Counsel v. DeAngelus*, 907 A.2d 452, 456 (Pa. 2006) (citations and quotations omitted).

Here, both the Hearing Committee and the Board found that Altman's testimony that he took responsibility and expressed remorse for his actions were not credible. Disciplinary Board Report and Recommendations, 5/30/19, at 16; Hearing Committee Report, 12/3/18, at 14. As noted, Altman testified that he took full ownership of his actions, yet at the same time he downplayed the seriousness of his misconduct by emphasizing that he did not threaten or coerce Cahill. N.T. 5/15/18, at 61. Although explaining that he was in a weakened state at the time of the misconduct, *id.*, he did not recognize that Cahill was also in a weakened state due to the recent death of her second husband, her challenging financial situation, her concerns about supporting her children and issues regarding her ex-husband's behavior toward the children. Furthermore, while stating remorse for his actions, his focus was on "what it's done to my life," *id.*, rather than on how it negatively impacted his client.

Altman's lack of disciplinary history as well as testimony regarding his character and reputation are properly considered when determining the appropriate discipline to be imposed. However, like the Board, we conclude that such evidence cannot overcome Altman's lack of genuine remorse and failure to appreciate the seriousness of his conflict of interest by engaging in sexual relations with his client and continuing to represent her

thereafter, especially when this misconduct was compounded by then engaging in business transactions with her. As the Office of Disciplinary Counsel argues, "Altman took advantage of . . . Cahill's extremely poor financial position, exploiting her situation so that he could demand additional fees . . . Cahill did not owe and repayment of loans . . . Cahill did not agree to incur." ODC's Brief at 26.

"This Court has declined to adopt a *per se* rule requiring disbarment for specific acts of misconduct." *Office of Disciplinary Counsel v. Chung*, 695 A.2d 405 (Pa. 1997). Accordingly, we emphasize that our conclusion Altman is unfit to practice law is not based solely on his sexual relationship with Cahill. Rather, our conclusion is further impacted by Altman's failure to ensure that Cahill's interests were properly protected in the course of their business dealings, and his abuse of the legal system to pursue her for expenses he could not properly document and for fees to which he was not entitled. Thus, it is the totality of the circumstances involving repeated instances of sexual contact, prohibited financial dealings and the filing of meritless civil actions that compels our decision to accept the Recommendations of the Board.

Altman took advantage of Cahill who came to see him when she was in a vulnerable state. Altman's disregard for the interests of Cahill and his abuse of his position as an attorney compel his disbarment, "an extreme sanction . . . properly reserved for the most egregious matters[.]" *Cappuccio*, 48 A.3d at 1238.

Altman is directed to comply with the provisions of Pa.R.D.E. 217, and pay costs to the Board pursuant to Pa.R.D.E. 208(g).

Chief Justice Saylor and Justices Baer, Todd, Donohue, Dougherty and Wecht join the opinion.